ARMANDO ALEJANDRO, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, FRANCISCO ESPINOSA, JUDGE, Respondent; NUMIDA GONZÁLEZ WIDOW OF GARCÍA, Intervener.

Nos. O-71-77, O-71-101.     Decided April 21, 1972.

600

*Daniel Pellón Lafuente* for petitioner. *Francisco Ponsa Feliú, Wilson F. Colberg,* and *Miguel A. Valldejuli* for intervener.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

These appeals raise the question whether the removal of the executor commissioner in partition of the testamentary inheritance left by José María García Veiga was for a just cause.

García Veiga was a native of the town of Pastoriza, province of Lugo, Spain. He was married to Numida González Mena. He died on December 3, 1967. His parents had died before him. He left considerable property in Spain and in Puerto Rico. He did not leave descendants. His last open will was executed on February 11, 1965.[1]

---

[1] The testator disposed of his property in the following manner:

a) As to the property located in Puerto Rico, in the first place, he made eleven legacies in ready money amounting to $10,000, in favor of nine natural persons and two specific juridical entities which he duly identified.

In the second place, "in the remaining of all the hereditary estate at the death of the testator, after the payment of necessary expenses and all the legacies . . . as to the property located in Puerto Rico, and as to a Fifty Percent (50%) of the same, he designates as his sole and universal heirs on equal shares, his brother Ramón García Veiga, the latter's wife, Carmen Martínez, his nieces, born from said spouses, Hilda or Gilda, Concepción, Esperanza, Carmen, and Isabel García Martínez; and as to a Thirty Percent (30%) of said hereditary estate, to his wife Numida González Mena and the corresponding usufructuary share . . . ."

He left the remaining 20% of that property located here, in equal shares, to his paternal half brother and sister named Genoveva and Constantino and to the heirs of his sister Josefa García Salgado, all residing in Spain.

b) "As to the properties of the hereditary estate existing in Spain . . . he designates as his sole and universal heirs in equal shares his

The testator "prohibits the judicial intervention in the operations of his inheritance, ordering that they be made in private; and he appoints Don José María Infanzón Trelles, Don Guillermo Infanzón Trelles, and Don Armando Alejandro, and in the event of the latter's death, his wife Gilda García Alejandro, of legal age and residents of San Juan, Puerto Rico, as testamentary executors to execute this will and at the same time as commissioners in partition of the inheritance with the necessary power to perform their commission, as to the inheritance in Puerto Rico, these appointments being understood to be of a successive character, that is to say, the first one will execute his office and in the event that for some reason or other he cannot carry it out the second one will substitute him and so on, until the last one; and as to the inheritance in Spain, he appoints Don Guillermo Ocampo, married to the testator's niece, Pilar García Mazoy; and Manuel Salgado Blanco, the former resident in Saldanje, Lugo, and the latter at Twelve Carmen Street, Madrid, Spain, as testamentary executors under the same conditions as those

paternal half brother and sister, residing in Spain, named Genoveva and Constantino and to the heirs of his deceased sister Josefa García Salgado, who are her sons and daughters Ángel, Manuel, Luis, José María, Marina, Alicia, Blanca, and Paz."

As to the property located in Spain he made the following three legacies:

(1) All the property he had acquired as his mother's inheritance, located at the Parroquia de Milleirós, Province of Lugo, for his cousins Manuel and Isabel Onega Veiga and to the children of his other cousin Carmen Onega Veiga, whose names he did not mention.

(2) For Genoveva and Constantino and to the heirs of his sister Josefa García Salgado, his share in current accounts in several Spanish banks.

(3) For his widow Numida González Mena, his share in a checking account in a bank of La Coruña, and in a house named El Foro, and

(4) The property he had in Spain, through his father's inheritance, for his brother Constantino.

By the Tenth clause he excluded his heirs residing in Puerto Rico—among whom was his widow, and forced heiress—"from all share in the property located in Spain."

in Puerto Rico and to the executors appointed for Puerto Rico and Spain hereby he extends the term fixed by law, for all the time necessary to carry out their commission without posting bond."

On December 15 of that year the two Infanzón Trelles brothers, appointed executors commissioners in partition regarding the hereditary estate located in Puerto Rico and to act in the first and in the second place, expressed in writing the nonacceptance of the office. Three days later Armando Alejandro accepted it, presenting the proper oath in writing. Through an order of the trial court of January 17, 1968, the proper letter testamentary was issued to him.

Later he undertook the duties of his office. On March 25, 1968, he filed the death certificate required by law, for the determination of the inheritance tax to be paid. With the consent of the majority of the heirs, he requested an extension of the term of the executorship to expire after the liquidation and notification of the inheritance tax which was granted to him on January 20, 1970. He carried out other steps in benefit of the portion of the hereditary estate located in Puerto Rico, which he would eventually distribute as commissioner in partition.

On January 21, 1970, the widow Numida González Mena requested the trial court to declare the executorship terminated and to appoint her as judicial administrator of the inheritance, because the legal term fixed for its performance had expired. After the petition was submitted by separate briefs, it was dismissed. The same thing happened to a motion for reconsideration.

At that stage of the executorship, on April 30, 1970, the coheiresses Esperanza, Carmen, Isabel, and Concepción García Martínez, nieces of the predecessor, as plaintiffs, filed before the same San Juan Part an action on nullity of the last open will executed by Don José María García Veiga, against his widow Numida González Mena. The other niece,

Gilda García Martínez was joined as defendant, because she refused to join as plaintiff.[2]

It was alleged in the complaint that said will "is null and void" because, on its date, the testator was totally disabled, mentally and physically and he was in no condition to validly execute a last will provision, and in the alternative, because it was executed through deceit, intimidation, and violence. It was also alleged that it was void because "it was not recorded in the Register of Wills of the Supreme Court of Puerto Rico during the twenty-four hours following execution."

Plaintiffs requested that the open will executed on February 11, 1965, should be declared void to declare valid the one executed by him on June 2, 1955, through which "80% of the hereditary estate is acknowledged to plaintiffs jointly with the defendant Gilda García Martínez, by themselves and as heirs of their father Ramón García Veiga, . . . without anything being acknowledged to defendant Numida González Mena as heir of her deceased husband, exception made of the widow's usufructuary share."

That same day, April 30, 1970, the defendant widow and the other coheiress involuntary defendant were summoned. The latter did not appear for any purpose whatsoever in the action, reason for which the following May 29 her default was entered.

On June 23, 1970, the widow answered the complaint. She accepted several of the facts alleged and denied the others. As affirmative defenses she stated that the complaint did not allege facts which would justify the granting of any remedy whatsoever and that the will whose validity was challenged "is valid and lawful, all the requirements of law having been observed in its execution, and the testator having been in condition of making a will as required by law." She requested the dismissal of the complaint.

---

[2] The other heirs and legatees to which reference is made in footnote 1 were not joined as defendants.

The executor Armando Alejandro was not made a party to that action.

On August 25, 1970, the widow filed another motion to remove the commissioner in partition. She stated in the motion:

"4—. . . understands that the present executor . . . is not qualified to act as such and/or [*sic*] should be removed from his office . . . for the following reasons:

"a) Because the most important power granted by law to the executor being that of seeing to the execution of the will and maintaining its validity in and out of court, the present executor does not have the purpose nor the intent of doing such things, nor has he performed any act up to this moment leading towards such ends despite the fact that the validity of the will under which he was appointed has been contested before this same Court in the Civil Action No. 70-20006, Esperanza, Carmen, Isabel, and Concepción García Martínez v. Numida González Mena and Gilda García Martínez defendants, on: Nullity of will and other particulars.

"b) Because the executor has an evident conflicting interest with the appearing party since he is the husband of Gilda García Martínez, who has common interests identical with those of the plaintiffs in the aforementioned action, despite the fact that she appears as codefendant.

"c) Because there is a clear incompatibility between the duties of the executor in office and the interests of the appearing party, particularly in view of the above-mentioned relation with the said Gilda García Martínez."

The executor raised objection to the same in the following terms:

"1) In regard to allegation No. 4, subdivision (a) of the motion, the executor alleges that he has not been sued in the action to which said allegation refers the heiresses mentioned in the same having been sued, alleging also that pursuant to § 824 of the Civil Code, 1930, the executor should see to the execution of the will and maintain its validity in and out of court, if he considers it to be just; and since he has not been sued in said action he does not have to intervene.

"2) In regard to subdivision (b) of allegation No. 4 of the motion, he alleges that there is not conflict of interest with the heiress Gilda García Martínez since the testator expressed his will by appointing him executor despite the fact that he knew said situation, and he also alleges that the executor represents the testator and not the inheritance; reason for which the conflict of interest does not lie.

"3) He denies what is alleged in subdivision (c) of allegation No. 4 of the motion alleging also that, since the executor is the agent of the testator and not of the inheritance, there cannot be any conflict between the heirs and the executor, since the latter derives his authority from the testator's will and from the will which appoints him and the will being the law of the inheritance it must be observed by the heirs more so if they are testamentary heirs."

On September 18, 1970, the hearing on the merits of this petition for removal was held, the widow and the executor commissioner in partition appearing through their respective attorneys. The moving party offered the record of the case on the nullity of the will as its only documentary evidence, and as its only oral evidence it presented the testimony of Alejandro himself. That was all the evidence presented in support of the removal in issue in that hearing. With the presentation of briefs by both parties the matter was submitted for determination.

On December 1, 1970, the trial court entered an order decreeing the removal of the executor commissioner in partition, the annulment of the letter testamentary and the submission within fifteen days of the final accounts of the executorship.[3] It refused to reconsider its decision.

---

[3] The text of such order in its pertinent part states:

".    .    .    .    .    .    .    .

"Petitioner's position is that the executor has not joined in the case to contest the will because if it is judicially declared that said will is void that would favor his wife under the terms of a previous will which would then remain in force. To questions of petitioner's counsel on this particular the executor did not answer. We are convinced by the executor's own testimony that he has decided not to intervene in the case to contest the

At the request of the executor we decided to review such order.

On March 25, 1971, the executor commissioner in partition requested the respondent court to grant a second extension of the term of his office, under the principal reason that, despite the steps he had taken, the Department of the Treasury had not yet liquidated the inheritance tax to be paid. The widow objected thereto, alleging that said extension "cannot be granted nor should be granted inasmuch as this court ordered the removal of the executor through an order dated December 1, 1970."

This petition for the extension of the executorship having been discussed in court, the trial court denied it, adducing the following as reason therefor, according to the minutes of March 23, 1971:

"Both counsel having been heard the court states that its order of March 30, 1970—date of the first extension—was definite, it will not exceed the extension of one year."

The same day in which the extension was denied to him, the executor commissioner in partition requested the reconsideration, invoking the provisions of § 826 of our Civil Code.[4]

---

will because that would benefit his wife, even though he will not be personally benefited.

.        .        .        .        .        .        .        .

"In our opinion, in doing nothing in view of the challenge of the will, the executor, Mr. Alejandro, has not performed his most important obligation, the defense of the validity of the will.

"Section 832 of the Civil Code establishes that the executorship terminates, among other reasons, by the removal of the executor. The Code does not say anything in regard to the reasons for the removal. That is left to the discretion of the judicial authority. In our opinion, and in view of the foregoing, the executor should be removed from his office.

"The letters testamentary issued in favor of Don Armando Alejandro on January 17, 1968, are annulled, and he is ordered to submit within the term of 15 days, the final accounts of his executorship."

[4] Section 826 of the Civil Code of Puerto Rico, 1930 ed. (31 L.P.R.A. § 2523), provides:

"The executor for whom the testator has not fixed a term must fulfill his office within a year, counted from his acceptance or from the

608

The trial court refused to reconsider, ". . . because the order of December 1, 1970, removing the executor from his office had been entered." We also decided to review this other order. Both petitions were consolidated.

Section 832 of our Civil Code[5] enumerates the causes which give rise to the termination of the executorship, including among them the removal of the executor. It does not say anything in regard to the reasons for the removal.

In Spain the same silence prevails in Art. 910 of its Civil Code. But there the case law of the Supreme Court and the comments of the most respected jurists have supplied it in a great part.

As to the Spanish case law, Albaladejo sums it up thus in his recent work *El Albaceazgo en el Derecho Español* 572 (1969):

"Basically, summing up: the S.C. in its case law has said that the following are causes for removal:

"1st. Those which make one incompetent to discharge the duties (judgments of February 4, 1902 and of July 5, 1947).

"2d. Those which make one incompetent to exercise the civil rights (judgment of February 4, 1902).

"3d. Misconduct in the execution of his functions (judgments of February 4, 1902 and of July 5, 1947).

"4th. The malicious use (to the prejudice of those called to the inheritance) of powers they do not have (judgment of July 5, 1947).

"5th. Negligence and poor administration which (even admitting that the office is granted for the time necessary to execute the will) is inferred from an excessive term (thirty-three years) without even having performed the inventory and appraisal of the hereditary estate (judgment of February 18, 1908)."

---

conclusion of the litigation which may have been instituted with regard to the validity or nullity of the will or of any one of its provisions."

[5] Section 832 (31 L.P.R.A. § 2529) reads thus:

"Executorship terminates by the death, incapacity, renunciation, or removal of the executor, and by the lapse of the term fixed by the testator, by law, and, in a proper case, by the persons interested."

Castán has synthesized the causes which give rise to the removal in the following manner:

"The Code incurs the unforgivable deficiency of not clarifying this matter by pointing out which are to be the just causes which give rise to the removal. In view of the omission of the law some commentators assumed that there were no available terms to successfully promote any sort of judicial removal. Others, like Mucius Scaevola, understood that the causes which give rise to the extinction of the contract of mandate and those which produce the indignity to succeed could be applied by analogy. Today the vacuum of the Code is for the most part cured by the case law of the Supreme Court.

"In effect, the judgment of February 4, 1902, establishes this important doctrine: a) That the silence of the law in regard to the causes for removal of the executors cannot be supplied with the analogical application of what has been prescribed with reference to any other juridical institution, for the only one by reason of which the Civil Code deals with the removal from offices is the guardianship, institution which does not have analogy with the executorship neither by the cause which is its basis, nor by its peculiar organism, or by the finality to which it answers. b) That in view of the lack of express legislation, and subject to the general principles of law, according to which the prohibitive laws and those which involve a penalty, cannot by any means be construed extensively, the causes for the removal of the executors should not be others than those which make one incompetent for the execution of the office or for the exercise of the civil rights, for the fundamental reason that he who lacks legal capacity to obtain an office cannot execute it, and, also, the misconduct of the executors, cause which is derived, first, from the incontrovertible principle to the effect that he who as a result of deceitful or fraudulent acts becomes unworthy of the executor's trust and shows that he lacks the essential condition to which he owes his appointment, should not exercise a duty or fill an office, relying exclusively on such trust, and second, from the rational principle that no one who maliciously contradicts the deceased's will can be his executor.

"The judgment of February 18, 1908, completes the doctrine intimating that the negligence, when bordering in fraud, may also be considered as a cause for removal, for it establishes that

it is proper to consider as such the nonfulfillment for a very long time of the will of the testator and the abusive conduct in regard to the management of the property, revealed principally by the lack of inventory of the property left by the testator at his death.

"In Alcubilla's opinion, it is evident, also, that the removal lies if the executor violates the prohibition established in number 3 of Art. 1.459, buying by himself or through a mediator property entrusted to him." IV Castán, *Derecho Civil Español, Común y Foral* 620–622 (1944 ed.).

See also: Albaladejo, *El Albaceazgo en el Derecho Español*, Part VII, pp. 563–586 (1969) ; VI-2 Sánchez Román, *Código Civil* 1461; Gómez Morán, *"El Ejecutor Testamentario en el Derecho Comparado"* 170; Roca Sastre in Kipp, Vol. V-II at 273; Ossorio Morales, *Manual de Sucesión Testamentaria* 460, Madrid, 1957 ed. by *Instituto de Estudios Políticos;* Luis Puig Ferriol, *El Albaceazgo* 256–258, Bosch ed., Barcelona, 1967; V. Valverde, *Tratado de Derecho Civil Español* 366, 4th ed. 1939, Valladolid.

■ In the light of the foregoing: Did there exist just cause to give rise to the removal of the executor commissioner? Obviously not. Let us analyze the two reasons expressed by the trial court to remove him from his office:

(1) "We are convinced by the executor's own testimony that he has decided not to intervene in the case to contest the will because that would benefit his wife, even though he will not be personally benefited."

(2) "In our opinion, in doing nothing in view of the challenge of the will, the executor, Mr. Alejandro, has not performed his most important obligation, the defense of the validity of the will."

The first one consists of an obviously mistaken statement and of a conclusion which not only results unfair for the executor, but is not supported by the only evidence presented by the widow in her intent to establish a just cause for removal.

The executor, only witness presented by the party bound to

establish that just cause, never said in absolute words that "he had decided not to intervene." And even less can the conclusion to the effect that he did not intervene because the contest of the will benefited his wife be inferred either. In his direct examination he stated thus:

"Q—Then, let us clarify something, Mr. Alejandro: If up to this moment you have not appeared to defend the will, despite the fact that you know that it is being contested in court, is your nonappearance due to the fact that you think it is not just to appear in court to defend it?

A—Well, I have not yet made an opinion on that matter." —Tr. Ev. pp. 13–14.

When in the course of the hearing held on September 18, 1970, the respondent judge himself asked him whether he had discussed with his attorney about the case of the contest of the will, the executor answered that he had discussed it and that they had "reached the conclusion that, I cannot intervene in the same until I am summoned, we have not discussed the legal aspects." Tr. Ev. p. 41.

On cross-examination, the executor, only witness for the widow, answered in the following manner:

"Q—Is it true or not, witness, that you called this counsel's office and told me that there was a complaint for nullity of will?

A—Yes, sir.

Q—Did this counsel ask you whether you had been sued in the action?

A—Yes, sir. ·

Q—What did this counsel tell you in regard to that?

A—Well, that as long as I was not sued I did not have to take part in the matter or in the action.

Q—Did he tell you to defend the will in an extrajudicial manner seeing to its execution between the heirs?

A—What do you mean?

Q—This counsel told you to go ahead executing the will . . .

A—Oh, yes! In all its parts.

Q—. . . in connection with the heirs?

A—Exactly.

Q—And with all the persons?

A—With all the persons involved.

Q—You have been executing it up to this moment?

A—I think so.

Q—And you will execute it as long as you are the executor?

A—Yes, sir.

Q—Your appointment as executor, from where did it arise?

A—From the will itself.

Q—From the will. And in the will, in that same will your wife is named heiress also with the other heiresses?

A—Yes, sir.

Q—That is to say, the testator was aware of the existence, that you were married to his niece?

A—Yes, sir.

Q—Have you had any conflict at any time, do you have any interest in the inheritance?

A—None.

Q—As executor you said you represented the testator?

A—Yes, sir.

Q—What is your function in this proceeding, in this executorship, what is your function?

A—Well, to follow the will according to the testator's will, and to defend the interests of all the heirs involved.

Q—Of all the heirs. And to administer the inheritance?

A—Administer the inheritance.

Q—Even to pay the inheritance tax?

A—Yes.

Q—In the event that you have a legal advice which you request, in the event that you were sued and you were told that you have to defend the will, would you defend it?

A—If that was the legal advice, I would carry it out.

.        .        .        .        .        .        .        .

Q—Do you have any interest in conflict in connection with your wife and the heirs by reason of being the executor? That is to say, interests in conflict in the inheritance.

A—I do not have any interest in conflict in the inheritance.

Q—Do you have any share in the inheritance, any interest in the inheritance?

A—I have none.

Q—Then you are acting in connection with and in compliance with the will?

A—Just as it is specified by the will.

Q—Nothing more, Your Honor."—Tr. Ev. pp. 41-46.

This is not sufficient ground to conclude that the executor, in a definite and unconditional manner, had decided not to intervene in the case concerning the contest to the will. And even less that he did not do so because by not doing it his wife was benefited.

Section 824 (3) of our Civil Code provides:

"Section 824(3).—Should the testator not have specially determined the powers of the executors they shall have the following:

(1) .      .      .      .      .      .      .      .

(2) .      .      .      .      .      .      .      .

(3) To carefully see to the execution of the other provisions of the will and maintain, *when just,* its validity in and out of court." (Italics ours.)

■■ The Code does not bind the executor to necessarily maintain such validity in any event, at all costs. He is certainly bound to maintain it when he is convinced that it is just, and if he does not do it then, he violates the obligation imposed upon him in that sense by Law, being liable for the damages which he may cause with such conduct. However, when he is convinced that it is not just to maintain it, his inactivity before the question is prudent and advisable.

Manresa comments this problem thus:

"D. *To see to the execution of the will and to maintain its validity in and out of court.*—This is the most important power granted to the executor.

"The executor is not, pursuant to law, the executor of all the testamentary provisions; but he is sort of an inspector who should see that all of them are complied with or executed. Let us say that he is also the defender of the will, being under the obligation to maintain the validity of all its clauses in and out of court, provided of course, that he considers it to be just. The testator states his will, wanting it to be complied with, and the

executor should defend that last will as the testator would have defended it if he were alive.

"This doctrine, faithful expression of No. 3 of Art. 902, is applied in the judgment of the Supreme Court of January 11, 1900.

"The executor defends extrajudicially the validity of the will as a whole and in that concerning its different clauses, provided that there is no judicial question in the previous meetings with the heirs, when the latter have doubt in regard to that validity or deny it, receiving advice from lawyers, proposing the solution through arbitrators or amicable referees, taking part in the transactions, etc. But the law could not impose that obligation in every case because it would be absurd that even though convinced of the nullity, he should, however, persist in defending the validity. Therefore the power and the duty only exist when the defense of the will is just. Therefore the executor cannot act moved only by his belief, but he should consult the question or questions which may arise, and once convinced of the reason or justice which moved the testator, to defend his last will. We do not think that because the will or any of its clauses is judicially declared void, the executor remains liable to the payment of expenses, costs, damages, etc., whenever he has acted in good faith and duly advised and convinced that it was just to defend the validity. What the provision contemplates is that it should not be understood that in every case, justly or unjustly, the executor should come to the defense of the will. Now then: if he acts in bad faith and it is thus declared, the solution would be different." VI Manresa, *Código Civil Español* 857–858 (7th ed.).

The trial court itself in the second page of its order cites the part of those commentaries where it is said that the executor should maintain the validity *"when he thinks it is just."*

■ On the other hand, on the several occasions when the executor was asked about the mental condition of the testator, whether he was sane or insane, unconscious or how was he, he answered that he had not been present when the will was executed, that "I could not give an opinion in regard to the

mental condition."—Tr. Ev. p. 37—If this is thus, what prejudice will those interested in the inheritance derive from his conduct of not defending the will unless he is sued in court?

It is to be assumed that the person who is in a better condition to maintain the validity of the contested will would be the testator's companion for many years, his widow Numida González Mena, not only because of the intimacy of their life together, but because from that will she derives the greater individual hereditary share of the hereditary estate, through the will of her deceased husband, besides her legal share in the usufructuary portion on the properties of the inheritance, equivalent to two thirds of the Spanish part in the inheritance and to one half of the Puerto Rican part, plus the special legacies, made as to certain properties and bank accounts in Spain, without mentioning her community or separate property in the hereditary estate. Therefore, nothing more natural that she, as the only party sued in the action, would answer promptly the complaint, denying its fundamental allegations and setting up as affirmative defense that "the will executed, object of this action, is valid and lawful, all the requirements of law having been observed in its execution, and the testator having been in a condition of making a will as required by law."

We have then, that the evidence presented by the widow showed that the executor, as soon as he learned of the action, consulted his attorney and the latter advised him not to intervene in the action until he was judicially notified of the action, making him a defendant in the complaint, and he did so "because that was my counsel's advice."—Tr. Ev. p. 13.

The reason which the trier attributes to the executor commissioner in partition not to intervene until he was sued, that is to say, "because that benefits his wife," does not have any support whatsoever in the evidence presented before

him. It was never established that he had violated his obligations, much less by reasons of selfishness, or to benefit the interests of his wife or of any other person. When he appointed him as executor and commissioner in partition the testator had full knowledge that he was the husband of his niece Gilda whom he also appointed executor in the event that her husband Alejandro died.

As it is alleged in the complaint for nullity of the will, at paragraph 7, she refused to become a party in the action, notwithstanding the fact that she would benefit in the event that the same prospered. She was joined in the action as defendant. In consonance with her position, she did not answer the complaint and her default was entered on May 29, 1970. The transcript of evidence shows the family measures which the executor carried out to prevent his wife's four sisters from filing the complaint, notwithstanding the benefit which his wife would receive therefrom.—Tr. Ev. pp. 17–19— In our opinion, among them, there does not exist a serious situation of conflict of interest. The heir with the higher share may be appointed executor, if he is of age and has the capacity to enter into a contract. Section 815 of the Civil Code.[6]

The conditioned abstention of the executor, formerly advised by his counsel, should not have been interpreted as his final and definite decision of not participating ever in the judicial controversy on the validity of the will. There is nothing in the record to show that his attitude of not participating therein, while he was not made a party thereto and summoned, constituted serious negligence, misconduct, or bad faith or that he violated his testamentary

---

[6] Section 815 of the Civil Code (31 L.P.R.A. § 2512) provides thus:

"No one without the capacity to enter into a contract can be an executor (*albacea*).

"A minor cannot be an executor even with the authorization of his father or of his guardian."

and legal obligations, or that he violated the trust which the predecessor deposited on him by appointing him executor of his last will, or that he became unworthy to act as such, which as we have seen are the causes which the Spanish doctrine and case law point out as reasons for the removal.

■ But there is more. In every action to annul a will it is necessary to sue the executor as well as all the heirs and legatees. It was thus provided by §§ 598 and 599 of the Code of Civil Procedure (32 L.P.R.A. §§ 2591, 2592) still in force. They read thus:

"§ 2591. Actions as to validity

"Whenever the validity of any will is contested, on the ground of noncompliance with the formalities required by law, or for want of testamentary capacity on the part of the testator, and whether or not it be alleged that there is another and valid will of either later or earlier date of execution, an action may be brought by any heir or executor or legatee named in any will the validity of which it is sought to establish, for the purpose of determining whether the decedent left a valid will, and, if so, in what document his last will and testament is contained.

"§ 2592. Where brought; parties

"Such an action shall be brought in the part of the Superior Court having jurisdiction of the last domicile of the deceased, or of the place where the greater portion of the property of the decedent is situated. The executor, heirs and legatees under any will alleged to be for the decedent and the validity of which is sought to be established or to be invalidated, may be made parties to the action."

In the instant case only the widow and one of the testamentary heirs have been sued. The action could not continue without the appearance of all the heirs and legatees mentioned in footnote 1, since no judgment invalidating the will could affect them without having had their day in court. The following is stated at p. 257 of the aforecited work of Albaladejo, *"El Albaceazgo en el Derecho Español"*:

". . . The executors should sue or defend if it is just. And even if the executors do not consider it thus, the heirs, however, may sue or defend. But to contest a will, anybody who does it, cannot ignore the executor and go directly against the heirs; he can, if he wants, direct himself against the latter, but he must necessarily direct himself against the former.

"The practical utility of having the person contesting the will direct his proceeding against the executor and the heirs consists—as Roca Sastre (27 bis) and Ossorio (28) observe—in that the judgment, which may be rendered, may cause effect even against the heirs; but it should not be forgotten, at least, that in questions regarding the validity or nullity of the testamentary provisions the presumption of res judicata is effective against third parties, even if they have not litigated, pursuant to Art. 1.253, par. 2d and judgments of June 10, 1902 (28 bis) and March 21, 1911 (28 ter)."

So that, it can be sustained that the most efficient method which the executor has to defend the will is not to request intervention, since without his presence in the action the will cannot be annulled.[7]

Since it is proper to set aside the order removing the executor it is not necessary that we pass on to determine in detail the second petition for certiorari, No. O-71-101, filed against the orders of March 23 and 29, 1971. The latter denied the extension of the term of the executorship requested on the 5th of the same month of March 1971, on the grounds that

". . . the order of December 1, 1970, removing the executor from his office had been issued."

■ When the action for nullity was commenced, a one-year extension being in force, by virtue of the provisions of § 826 of our Civil Code, the term of the executorship was automatically extended up to one year after the conclusion of "the litigation which may have been instituted with regard

---

[7] On indispensable parties see: *Fuentes* v. *District Court*, 73 P.R.R. 893 (1952); 2 Barron & Holtzoff, *Federal Practice & Procedure*, § 512; 3A Moore's *Federal Practice* 2219, § 1907 (1970 ed.); R. Hernández Colón, *Manual de Derecho Procesal Civil*, §§ 1104 and 1304.

to the validity or nullity of the will or of any one of its provisions."

The action on nullity commenced on April 30, 1970. So that, after that date, it was not necessary to request from the trial court any extension whatsoever of the term of the executorship.

In view of the foregoing, judgment shall be rendered setting aside the orders appealed from object of both appeals.

Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Rigau took no part in the decision of this case. Mr. Justice Martín concurs in the result.

